FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ FEB 0 1 2021 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

IN RE PROPECIA (FINASTERIDE)     MASTER FILE NO. 1-12-md-02331-VG-VVP
PRODUCTS LIABILITY LITIGATION   MDL NO. 2331



CV 21 - 0693

KOMITEE, J.

BLOOM, M.J.

MELVIN SHADDIX HUTSON          CAUSE NO.
Plaintiff                      DIVISION

vs.

MERCK & CO., INC. &
MERCK SHARPE & DOHME CORPORATION
Defendants

RECEIVED
FEB 0 1 2021
PRO SE OFFICE

## COMPLAINT

### PARTIES/VENUE/JURISDICTION

1 Plaintiff Melvin Shaddix Hutson (usually identifies as Mel S. Hutson) was born in 1968, graduated from Tulane Law School in 1995, and primarily practiced HR law both in private practice and for the U.S. government Department of Interior until he went on disability in Dec. 2015, which continues to date. Plaintiff is a resident of Washington DC and member of the DC Bar.

2 Defendant Merck & Co., Inc., is a publicly traded pharmaceutical entity. Defendant Merck Sharpe & Dohme, Corp, is its wholly owned subsidiary. Both are incorporated in New Jersey and headquartered at 2000 Galloping Road, Kennilworth, NJ 07033. They designed, market, and sell Propecia ("the Drug"), a hair loss prevention drug, and Belsomra, a sleep drug.

3 Venue lies in this Court pursuant to a MultiDistrict Panel Order. Jurisdiction is established by the parties' differing state citizenships and because Plaintiff seeks more than $75,000 from Defendant.

4 In this action Plaintiff solely seeks damages flowing from the sleep dysfunction caused by the Drug.

### GENERAL FACTS

5 Plaintiff was normally healthy until he began taking the Drug beginning 1999. He continued taking the drug daily for 15 years to inhibit hair loss. He took the drug almost every single

morning, very rarely missing normal 1mg daily dose. He always obtained prescriptions and always purchased the drug from a drug store. He frequently recommended it to balding men he met.

6 In 2006 Plaintiff permanently switched to finasteride, the generic equivalent of Propecia, to save money, Plaintiff always obtained prescriptions and legally purchased 5mg tablets of the drug, invariably cutting them equally into four 1.25 mg portions. Plaintiff never took more than 1.25 mgs per day.

7 Several doctors in Atlanta (1999-2005) and Washington DC (2005-14) over those 15 years prescribed the Drug every six months. Most warned Plaintiff that he would lose all hair preserved by the Drug "within one year" if he discontinued taking it. None warned - or apparently understood - that the Drug could trigger a "nightmare smorgasbord" of maladies, including profound sexual, emotional, and sleep dysfunction. Plaintiff also initially read and occasionally reread the box and bottle warning labels. Plaintiff does not recall if he read the detailed pamphlet included in box.

8 Plaintiff was never aware until December 2014 that the Drug potentially caused sleep dysfunction. In 2020 Plaintiff first became aware that at least two medical journal articles have definitively linked the Drug to sleep dysfunction, including "Finasteride is associated with a higher odds of obstructive sleep apnea (OSA): results from the US FDA Adverse Events Reporting System" and "Finasteride and Suicide: A Postmarketing Case Series," by Dr. Michael Irwig in 2020..

9 In his article Dr. Irwig writes: "Neurosteroids play an important role in neurogenesis, synaptic plasticity and myelination. A study of male mice found that treatment with finasteride for 7 days resulted in a reduction of young neurons in the hippocampus." Plaintiff ingested daily 1mg or 1.25mg of finasteride for 15 years. Hippocampus damage impairs sleep.

10 From 1999 through 2014 Plaintiff did not take or use drugs other than the Drug, social alcohol, seasonal allergy medications, and occasional pain pills. He was an extremely healthy triathlete, exercised regularly, never depressed, and had a normal social and work life. Indeed, obtaining prescriptions for the Drug was the primary reason Plaintiff consulted doctors from 1999-2014. Plaintiff virtually never took sick days from work since he was perfectly healthy.

11 From 1999-Dec 2014, the Drug caused significant erectile dysfunction (ED). Before sexual intercourse, Plaintiff had to take Viagra or Cialis.

12 By late 2014 those drugs no longer worked for Plaintiff and he could not engage in intercourse with sexual partners because the Drug had rendered him mostly impotent. Fortunately, his ED resolved by June 2017.

13 By June 2014 the Drug likewise had severely damaged the sleeping functions of his brain. From June to November 2014 Plaintiff's sleep dropped from 7 hours a night to zero hours daily. Plaintiff did not sleep from December 2014 to May 2015 when doctors prescribed mirtazapine/nortryptiline combo, which restored normal sleep until November 2016.

14 In December 2014 Plaintiff permanently discontinued the Drug. A few days later this triggered Post Finasteride Syndrome (PFS), including total loss of emotions/libido, "raccoon" eyes, body feminization, penile pain, "unreality" perception, hallucinations, depression, and suicidal ideation.

15 Plaintiff immediately researched these maladies and found www.pfsfoundarion.org and learned they were typical PFS maladies.

16 However, sleep dysfunction is not a "post" finasteride malady in Plaintiff's case. It manifested in the last six months of taking the drug.

17 Plaintiff also joined PFS forums where members discussed maladies identical to his and which members claimed the Drug caused. Many members complain about Drug sleep dysfunction.

18 To escape the "insanely horrific" PFS maladies, Plaintiff almost committed suicide several times, including almost jumping off a cliff, almost jumping in front of trucks, five months starvation, and twice trying to purchase a gun. Plaintiff also had countless suicidal "fantasies," including drowning, car crashes, and hanging between Dec 2014-June 2017, when PFS ED resolved.

19 All direct Drug maladies resolved by May 2015 except depression, ED, suicidal ideation, and sleep dysfunction. ED, suicidal ideation, and depression resolved by June 2017. Since June 2017 sleep dysfunction has been Plaintiff's sole malady directly caused by the Drug.

20 To escape PFS Plaintiff starved himself from January to May 2015 after attempting other suicide methods. This nutritional deprivation caused severe double vision, vertigo, rolling eyes, dizziness, vocal ataxia. It did not affect Plaintiff's sleep dysfunction. The indirect maladies have now resolved except for moderate vocal and motion impairment. Sleeping dysfunction by contrast has not resolved or improved since June 2014 but is partially mitigated by drugs. In this action Plaintiff solely seeks damages caused by Drug sleep dysfunction.

## MEDICAL APPOINTMENTS

21 Plaintiff always went to medical doctors or the ER when maladies manifested. For example, in early 2015 an ER doctor advised Plaintiff that he was probably the first ER patient ever to be tested for testosterone levels but such test was justified by Plaintiff's maladies.

22 After December 2014 Plaintiff advised doctors his maladies matched PFS but most doctors ignored or did not understand PFS.

23 Plaintiff has been treated by 50+ conventional medical doctors, including multiple neurologists, urologists, sleep specialists, psychiatrists, etc.; had six head MRIs; and thousands of pages of medical records memorialize medical evaluations.

## PLAINTIFF'S EMPLOYMENT

24 Plaintiff worked as a GS-14 HR attorney-advisor from 2008-15 for the US Department of Interior. Plaintiff had passed his probationary period in 2010 and could not be removed from his position without the equivalent of "just cause." Plaintiff had planned on working until age 70 and was receiving fully successful performance ratings every year and never had misconduct issues, so would have remained a GS-14 attorney indefinitely.

25 Plaintiff resigned from this permanent position in December 2015 for medical reasons and eventually was awarded disability for "traumatic brain injury." Plaintiff's health status was so dire that disability was atypically awarded without hearing and renewed in May 2018 for three years. Plaintiff will reapply in May 2021 since he continues to suffer profound sleep dysfunction and moderate sleep/motion dysfunction (ataxia).

## SLEEP DYSFUNCTION

26 Prior to June 2014, Plaintiff slept perfectly normally, typically seven hours straight and very rarely used or needed sleeping pills. Plaintiff slept so well that he very rarely napped.

27 Since June 2014 the Drug has caused Plaintiff to suffer profound, unique, unprecedented, shocking - "shambolic" - sleep dysfunction.

28 Beginning June 2014 Plaintiff suddenly could not sleep more than four hours a night. Plaintiff initially functioned normally. However, sleeping dysfunction drastically worsened in the next few months. By December 2014 Plaintiff could not sleep at all and could not function. His head felt like it weighed 50 pounds, hurt intensely, and Plaintiff was miserable and frightened. He took off work until July 2015.

29 He went to the local ER but its doctors provided no helpful relief - totally useless melatonin - and could not explain his sleeping dysfunction.

30 At the time Plaintiff was not aware the Drug exclusively had triggered profound sleep dysfunction.

31 On December 6, 2014, Plaintiff's 46th birthday, Plaintiff arranged expedited testing for sleep apnea/CPAP but could not fall asleep during the overnight testing, so the test was canceled without any report.

32 Around this time he wrote a "death note" since he anticipated the horrific and unbearable "terminal insomnia" would kill him soon.

33 As referenced in note, Plaintiff did consign his entire movie poster collection and instructed consignor to send all proceeds (ultimately totaling $96,000) directly to his father since he did not expect to survive. Plaintiff did not give note to family and lost track of note but found it years later.

34 From December 2014-May 2015 Plaintiff almost entirely stayed in his apartment totally sleepless. Plaintiff's sleep dysfunction has continued unrelentingly since June 2014.

35 In February 2015 Plaintiff scheduled an appointment with Dr. Michael Irwig, a top PFS doctor, who bluntly told Plaintiff he had "incurable, untreatable, and unrecoverable" PFS. Plaintiff does not recall if they discussed sleep dysfunction. Last year Dr. Irwig published a medical journal article proving the Drug commonly triggers suicide-inducing profound sleep dysfunction.

36 Friends, family, and coworkers were extremely worried about Plaintiff. Local police twice entered Plaintiff's apartment for wellness checks and took Plaintiff briefly to ERs, which quickly discharged him.

37 Plaintiff did not sleep at all until May 2015 when taken unconscious and near-death to medical facilities for six weeks recovery. Plaintiff has no memory of the initial days of this recovery. He woke up in critical care unit. Doctors successfully but temporarily resolved his sleep dysfunction by prescribing mirtazapine and Nortriptyline. Unfortunately that drug combination ceased working in November 2016 and profound sleep dysfunction resumed.

38 Plaintiff went to the Mayo Clinic in January 2017 unsuccessfully seeking sleep advice and remedies and other relief. Mayo's sleep expert MD recommended sleep testing (which was inappropriate because Plaintiff never slept), and did not prescribe any sleep remedies. Plaintiff paid $22,000 out-of-pocket to Mayo for the four day visit.

39 Since November 2016 Plaintiff has rarely slept unconsciously and subsists primarily on random short "rest naps" or "drowsy resting" bouts during which he remains partially or mostly conscious but sleepy and semi-paralyzed by exhaustion. These occur randomly and last for random lengths of time. It typically takes 30 minutes to begin functioning normally after these. It is impossible for Plaintiff to sleep naturally and Plaintiff frequently does not sleep for weeks or months straight.

40 From late 2019 to date Plaintiff often contemporaneously and accurately maintained a sleep journal, which reveals out-of-control profound/shambolic sleep dysfunction.

41 Plaintiff's sleep has improved in 2020 because Belsomra began semi-consistently inducing some nightly sleep. Previously, Belsomra erratically induced sleep or even drowsiness so Plaintiff likewise erratically used it.

42 Plaintiff has reported and described his sleep dysfunction many times to medical professionals, friends, family, and on PFS forums. He frequently has described it to them in "colorful" but truthful terms, including "non-sleeping chaos," "rest nap purgatory," "I survived and escaped the living hell of PFS but I'm still a sleepless zombie," "I live a Twilight Zone sleepless existence," "I do NOT 'enjoy' the freakiest sleeping dysfunction in human history," etc.

44 Neurologist Dr. Russ Bodner originally prescribed Belsomra in January 2018, eventually agreeing that Plaintiff suffers sleep dysfunction caused by the Drug.

45 Plaintiff also has consulted MD sleeping expert Dr. Richard Waldhorn, who, like the Mayo sleeping expert, does not know how to assess or relieve Plaintiff's unique - indeed seemingly impossible - sleeping dysfunction, other than by represcribing Belsomra. In 2020 Dr. Waldhorn declined Plaintiff's request for a sleep study test because (a) Plaintiff had unsuccessfully tried an overnight sleep test before and (b) Plaintiff generally can function normally when not rest napping or - rarely - sleeping.

### INCOME LOSS

46 Since December 2016, Plaintiff's profound/unique sleep dysfunction has precluded him from working because he cannot attend work regularly or fulfill work duties reliably, predictably, or in a timely manner during regular working hours. He would have earned a GS-14 salary during the last three years.

47 The drafting of this Complaint illustrates Plaintiff's "shambolic" current inability to work a conventional 9-5 job. He wrote the Complaint primarily late at night and random times during first week of this year. He corresponded with potential witnesses at all hours of day, taking frequent rest naps on nearby couch. No employer could tolerate this erratic work schedule and endless random naps during scheduled work hours.

49 Plaintiff likewise has missed several medical appointments due to erratic sleep dysfunction.

49 Since Jan. 2016 Plaintiff has received disability from Social Security and OPM. From December 2015 through 2019, Plaintiff's impaired voice independently precluded working jobs with significant vocal duties but Plaintiff could have worked GS-14 attorney jobs with limited vocal duties with reasonable accommodations (excluding consideration of sleep dysfunction). By April 2020, after extensive vocal therapy, Plaintiff's voice had significantly improved to

6

"moderate" impairment, thereby allowing him to work most jobs with reasonable accommodation (excluding consideration of sleep dysfunction).

50 Plaintiff has not received or earned retirement benefits since December 2015 he would have earned if had not suffered sleep dysfunction.

### GENERAL DAMAGES, INCLUDING STRESS

51 Plaintiff has incurred and experienced considerable general damages and distress from direct and indirect effects of sleep dysfunction. Plaintiff always feels significantly distressed he cannot sleep, does not feel "fully alive," "rest naps" are stressful and unpleasant, he feels dazed and "fuzzy headed" after extended sleepless periods, and his social interaction and general enjoyment of life are limited.

52 However, Plaintiff always has tried to exhibit a cheerful/positive/stoic attitude, not excessively "dumped" his sleeping dysfunction trauma on others, and tried to enjoy life as much as possible. Plaintiff frequently tells others "I'm very grateful I'm approximately 80% healed of traumatic injuries that flukishly occurred in 2014."

### FIRST CAUSE OF ACTION (STRICT LIABILITY)

53 Plaintiff incorporates by reference all the foregoing paragraphs of the Complaint. Defendants' Drug is defective and unreasonably dangerous. Plaiintiff took drug for 15 years, causing injurious sleep dysfunction described in this Complaint.

### SECOND CAUSE OF ACTION (BREACH OF IMPLIED WARRANTIES)

54 Plaintiff incorporates by reference all the foregoing paragraphs of this Complaint. Defendants impliedly warranted that the Drug was merchantable and safe and breached such warranties. Plaintiff took drug for 15 years, causing injurious sleep dysfunction described in this Complaint.

### THIRD CAUSE OF ACTION (BREACH OF EXPRESS WARRANTY)

55 Plaintiff incorporates by reference all of the foregoing paragraphs of the Complaint. Defendants expressly warranted to Plaintiff and his doctors that the Drug was safe. They relied on this warranty. Plaintiff took drug for 15 years, causing injurious sleep dysfunction described in this Complaint.

### FOURTH CAUSE OF ACTION (NEGLIGENCE)

56 Plaintiff incorporates by reference all of the foregoing paragraphs of the Complaint. Defendants negligently designed, marketed, and sold the Drug to consumers like Plaintiff. Plaintiff took drug for 15 years, causing injurious sleep dysfunction described in this Complaint.

**WHEREFORE**, Plaintiff requests the Court award him all proven compensatory, special, punitive, attorneys fees and legal expenses, and any other damages this Court finds appropriate. Plaintiff elects to forego trial by jury.

Dated: January 14, 2021

Mel S. Hutson, Pro Se
4000 Massachusetts Ave #325
Washington DC 20016
202-569-1308
Mel.Hutson@yahoo.com

**Mel S. Hutson**
205 S Kings Dr Apt 128
Charlotte, NC 28204-2664

15-7444/2540

490

1/14/2ANY

PAY
TO THE
ORDER OF _Court Clerk_ 450C EDNY | $ 402.00

_Fur-hundred Two_ DOLLARS

DEPARTMENT OF INTERIOR FCU

Security features
are included.
Details on back

FOR _filing fee_

⑆254074442⑆ 1090051177001440490

MP



NOTE TO PRO SE OFFICE:

14 Jan 2021

Please file ASAP and notify me when filed.  Thx.

Mel S. Hutson
4000 Massachusetts Ave NW,   #325
Washington DC 20016
202-569-1308
Mel.Hutson@yahoo.com

Mel Hutson
Judd Mass Ave
Washoc
loolb

USDC,
Att: Pyrc Office

RECEIVED
PRO SE OFFICE
FEB 01 2021

Brooklyn
225 Cadman Plaza East
Brooklyn, NY 11201

EDNY
USMS
Pro Office